**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Berkadia Real Estate Advisors LLC, | No. CV-22-00049-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| Arthur R Wadlund, et al., | |
| Defendants. | |

Before the Court are Defendant Arthur R. Wadlund's Motion to Dismiss Plaintiff's First Amended Verified Complaint (Doc. 36), Defendant Clint Wadlund's Motion to Dismiss Plaintiff's First Amended Complaint or in the Alternative[,] Abstain (Doc. 37), Plaintiff's Motion to Vacate Order Denying Plaintiff's Motion for Temporary Restraining Order (Doc. 41), and Defendants Arthur R. Wadlund and Clint Wadlund's Motion to Quash Subpoenas and for a Protective Order (Doc. 63)**.** For the reasons that follow: the Court denies the motion to vacate the Order denying the TRO; grants the motions to dismiss, with leave to amend; denies the request for abstention; grants the motion to quash subpoenas to non-parties, without prejudice, and denies the request for a protective order.

## BACKGROUND

The father and son commercial real estate team of Arthur ("Art") and Clint Wadlund were a successful component of Plaintiff Berkadia Real Estate Advisors' presence in Tucson, Arizona, since 2013. Working as independent contractors in a downtown office, the Defendant Wadlunds routinely increased annual sales revenue and became a valuable

lifeline to the Tucson commercial real estate market. This case arises from the Wadlunds' departure from Berkadia to work for a competing firm. Plaintiff sent the Wadlund Defendants a cease-and-desist letter, and the Wadlunds[1] sued Berkadia in state court for declaratory relief stating that Berkadia may not impede their ability to continue work as real estate salespersons and damages for breach of the Independent Contractors' Agreements. Berkadia answered in state court and filed in this Court raising numerous state law claims and a single violation of the Defend Trade Secrets Act ("DTSA"), under 18 U.S.C. § 1836. *See* First Amended Complaint (FAC) (Doc. 29). The state and federal cases arise from the same set of facts and involve the same state law claims, with Berkadia adding the DTSA claim, here, invoking federal subject matter jurisdiction.

The Wadlund Defendants each file a motion to dismiss Plaintiff Berkadia's federal claim and argue that any remaining state-law claims should be handled in state court. It is the responsibility of this Court to determine whether Plaintiff has sufficiently stated a claim for federal jurisdiction. If not, the Court must determine the best forum to expeditiously address the remaining state law claims.

Defendant Clint Wadlund alternatively argues that this Court should abstain in his case "in light of the pending litigation in Pima County Superior Court." (Clint Wadlund's Motion to Dismiss, Alternative Motion to Abstain (C. MTD/Abstain) (Doc. 37) at 6.) "Where there are concurrent court proceedings, a federal court may abstain from a case for the sake of conserving judicial resources while ensuring that claims are comprehensively adjudicated." *Id.* (citing *Colorado River Water Conservation Dist. V. United States,* 424 U.S. 800, 817-18 (1976)).

## PROCEDURAL HISTORY

On January 31, 2022, Plaintiff filed this action and simultaneously filed a Motion for Temporary Restraining Order (TRO) and Motion for Expedited Discovery (Motion for TRO (Doc. 7)). The case was assigned to the Honorable John C. Hinderaker. After full briefing and a hearing, on March 3, 2022, Judge Hinderaker denied the motion for the TRO

---

[1] Defendants filed separately in state court: Art's case is C20220345 and Clint's is C20220343.

1   and expedited discovery. On March 14, 2022, Plaintiff filed a motion for recusal. On March
2   16, 2022, Judge Hinderaker recused himself from the case, and it was reassigned to this
3   Court.

**MOTION TO VACATE ORDER**

5        On March 28, 2022, Plaintiff filed the motion to vacate Judge Hinderaker's Order
6   denying the TRO. (Doc. 41.) Plaintiff asks this Court to vacate Judge Hinderaker's Order
7   (Doc. 31) denying the TRO because, as evinced by Judge Hinderaker's recusal, he was
8   disqualified due to a conflict when he denied the TRO. According to Plaintiff, it is entitled
9   to the requested remedy of revocation, and it is necessary to avoid the appearance of
10  partiality and to retain public confidence in the fairness of judicial proceedings.

11       In response, Defendants argue that revocation is not merited. Defendants accuse
12  Plaintiff of simply being unhappy with Judge Hinderaker's ruling denying the TRO.
13  Defendants point out that Ted Hinderaker's name and email was contained on an exhibit
14  attached to Plaintiff's reply, filed February 21, 2022, supporting its motion for a TRO, yet
15  Plaintiff did not complain or inquire regarding any conflict with the assignment of the case
16  to Judge Hinderaker. Plaintiff remained silent at the hearing before Judge Hinderaker,
17  when it could have inquired whether there was any relationship between the Judge and Ted
18  Hinderaker. Plaintiff did not seek recusal until after Judge Hinderaker issued his decision.
19  According to the Defendants, Judge Hinderaker did not have to, but did timely recuse
20  himself. In recusing himself, Judge Hinderaker made it clear that he was unaware of any
21  relationship between Defendant Arthur Wadlund and his brother. Therefore, there could be
22  no bias in the "thoughtful 31-page opinion" issued by Judge Hinderaker. Defendants ask
23  this Court to deny the motion to revoke Judge Hinderaker's Order denying the Plaintiff's
24  request for a TRO. (Ds Resp. MTV (Doc. 42) at 1-4).

25       The recusal statute, 28 U.S.C. § 455(a), provides: "Any justice, judge, or magistrate
26  judge of the United States shall disqualify himself in any proceeding in which his
27  impartiality might reasonably be questioned." Judge Hinderaker recused himself, pursuant
28  to this provision, after receiving a motion seeking recusal (Doc. 34), filed by Plaintiff on

March 14, 2022, which alleged a personal and professional relationship by his brother, Ted Hinderaker, with Defendant A. Wadlund. Ted Hinderaker is a prominent real estate attorney in Tucson, who has represented Defendant A. Wadlund on multiple occasions, including at least one transaction at issue in this case. Plaintiff argues that Judge Hinderaker's denial of the TRO directly benefited his brother because Ted was a third party involved in one of the four transactions, who Judge Hinderaker indicated might suffer unintended consequences if he entered the TRO. (P. Reply MTV (Doc. 44) at 4 (citing Order (Doc. 31) at 28.) Further, Plaintiff alleges Ted Hinderaker may be a material witness in the case.

Plaintiff is correct that a court must recuse when the provisions of 28 U.S.C. § 455 are implicated, but a court also has an obligation to hear all cases assigned to it when there is no legitimate reason to recuse. *United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008). The recusal statute strikes a balance between these goals; it "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). The standard for recusal avoids "wasted judicial time and resources and a heightened risk that litigants would use recusal motions for strategic purposes." *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (cleaned up) (explaining judicial rulings alone almost never constitute a valid basis for recusal). There is a presumption that a recusal petition submitted after the moving party suffers adverse rulings has been filed for suspect tactical and strategic reasons. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992).

Judge Hinderaker recused pursuant to 28 U.S.C.A. § 455(a) which requires a judge to disqualify himself "in any proceeding in which impartiality might reasonably be questioned." "The goal of section 455(a) is to avoid even the appearance of partiality." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988) (simplified).

Judge Hinderaker did not disqualify himself for one of the express reasons specified in subsection (b) as an actual conflict, which includes: personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the

- 4 -

proceeding, 28 U.S.C. § 455(b)(1), or if a person within the third degree of relationship to him is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding, *id.* (5)(iii-iv). *See* (Motion for Recusal (MFR) (Doc. 34) (seeking recusal pursuant to 28 U.S.C. § 455(a) and (b)(5)(iii-iv)).

The distinction between the subsections of 28 U.S.C. § 455 is important because subsection (a) requires recusal where there is the appearance of improper partiality and subsection (b) requires that the judge know of an enumerated impropriety. Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." 28 U.S.C. § 455(e). In other words, Judge Hinderaker recused under circumstances that would have allowed a waiver of the disqualification. *See* 28 U.S.C. 455(e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)).

Judge Hinderaker applied an objective standard for the disqualification under § 455(a), which contemplates whether "a reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned." *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993). This is especially important because the motion for recusal was made after Judge Hinderaker denied Plaintiff's motion for the TRO. Plaintiff cannot dispute it had evidence of the alleged conflict prior to Judge Hinderaker's ruling because it attached the email with Ted Hinderaker's name in the email-string to its reply supporting the motion for the TRO. While the motion for recusal, filed on March 14, asserts the conflict came to Plaintiff's attention during the prior week, the reply tells a different story because it was filed on February 21, 2022.

This Court is not assessing the propriety of Judge Hinderaker's decision to recuse himself, but considers only whether "once disqualification is established, Plaintiff is entitled to a remedy to serve the purpose of the rules requiring recusal. (MTV (Doc 41) at 5 (citing *Liljeberg,* 486 U.S. at 865). Plaintiff asks the Court to consider: 1) the risk of injustice to the parties in the particular case; 2) the risk that the denial of the revocation

will produce injustice to the parties in a particular case and in other cases, and 3) the risk of undermining the public's confidence in the judicial process. *Id.* Under this standard, Plaintiff argues that Judge Hinderaker's Order denying the TRO should be vacated because as evidenced by his recusal, he was disqualified from ruling on the TRO, and it must be revoked to remedy this impropriety.

The Court is not persuaded by the allegations of bias because there is no evidence that even suggests Judge Hinderaker knew at the time he denied the TRO about his brother's alleged long-term friendship and professional relationship with Defendant Arthur Wadlund. Even assuming it is true that Judge Hinderaker's denial of the TRO "undoubtedly benefits the financial interests of his brother because of both pending transactions and the potential for Defendant A. Wadlund to refer future business to Ted Hinderaker," (P. Reply MTV (Doc. 44) at 4), this is not enough to disqualify Judge Hinderaker. To require disqualification for bias under 28 U.S.C. § 544(b)(5)(iii-iv), a judge must know that the "person within the third degree of relationship to him" has an interest that could be substantially affected by the outcome of the proceeding. Plaintiff ignores the fact that Judge Hinderaker denied the TRO before he knew of the alleged involvement his brother may have in the case, which may or may not be substantially affected by the outcome of the proceeding. The decision Plaintiff seeks to vacate was issued before Judge Hinderaker was disqualified.

In this case, the Court finds that there is little risk for any of the factors discussed in *Liljeberg* to be present. Plaintiff's assessment of risk completely ignores the facts of Judge Hinderaker's recusal. Until the motion for recusal was filed, Judge Hinderaker had no reason to know of any involvement by his brother in this case whatsoever. There is no evidence that Judge Hinderaker was aware that his brother's name was contained in an email-string in one of the exhibits attached to Plaintiff's reply. Unlike Plaintiff's responsibility to assess the merits of its case, including the significance of its own evidence, the Court is not a pig hunting for truffles buried in briefs. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). This Court has reviewed Plaintiff's reply supporting its motion

for TRO (Doc. 21) and finds that Exhibit 2.L (Doc. 24-4), which contained the email string that apparently triggered Plaintiff to investigate and find the link between Ted Hinderaker and Judge Hinderaker, was not cited in the memorandum brief. There was no reason for Judge Hinderaker to look at the exhibit, where he may have noticed his brother's name in the email string. Until Judge Hinderaker received the motion for recusal, he had no knowledge of any fact to trigger the court's burden to assess the question of conflict and recusal. *See Holland*, 519 F.3d at 911–12 (explaining the balance between judicial duty to administer justice faithfully and impartially for all persons, which precludes the courts from picking and choosing cases, and the proposition that a judge may not sit in cases in which his impartiality might reasonably be questioned).

There is no risk of undermining the public's confidence in the judicial process because as soon as the conflict came to Judge Hinderaker's attention, he recused himself. At the time Judge Hinderaker ruled on the motion for the TRO, no reasonable person would be convinced the judge was biased in a way that may have prevented a fair decision on the merits. *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985).[2] The Court is confident in this finding because "[t]he reasonable third-party observer is not a partly informed man-in-the-street, but rather someone who understand[s] all the relevant facts and has examined the record and law." *Holland,* 519 F.3d at 914. (internal quotations omitted). The inquiry requires "an independent examination of the unique facts and circumstances of the particular claim at issue." *Id.* at 913. On the facts of this case, no reasonable person would find an appearance of impropriety in Judge Hinderaker's ruling on the TRO when he did not know of the alleged involvement in the case by his brother.

If this court were to vacate Judge Hinderaker's Order, it would encourage parties to waste judicial time and resources. Both parties knew or should have known of the alleged conflict, and both remained silent when they could have enlightened Judge Hinderaker of the potential conflict prior to his expending time reviewing, hearing, and issuing the Order

---

[2] *See also Liteky v. United States*, 510 U.S. 540, 553–56 (1994) (defining bias as animus or malice of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes).

on the TRO. Revoking the Order issued by Judge Hinderaker would also heighten the risk that other litigants may use recusal motions for strategic purposes. As for whether granting or denying revocation will produce an injustice to the parties in a particular case and in other cases, the Court notes that there is minimal persuasive value to the decision because it issued as a preliminary ruling based on a limited record, *Stormans v. Selecky*, 844 F.Supp 2nd 1172, 1187-88 (Wash. 2012), and a likelihood of success on the merits, which differs from the standard for actual success on the merits, *Lorillard Tobacco Comp. v. Engida,* 611 F.3d 1209, 1217 (10th Cir. 2010).

Judge Hinderaker granted Plaintiff's motion for recusal to avoid the appearance of impartiality and did so after he had invested substantial judicial time to the matter of the TRO and, immediately, after Plaintiff brought the alleged conflict to his attention in a way that made it clear that waiver would not be an option. The Court finds no facts or law to support Plaintiff's assertion that Judge Hinderaker was disqualified by any bias at the time he ruled to deny the TRO. The Court denies the motion to revoke.

## MOTIONS TO DISMISS

On March 15, 2022, Defendants filed their respective motions to dismiss. (Docs. 36, 37.) The motions are fully briefed. For efficiency, the Court construes Defendants' motions to dismiss as one joint motion for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons explained below, the Court does not dismiss for lack of jurisdiction pursuant to Rule 12(b)(1).

Defendants argue that if the Court finds the Plaintiff fails to state a claim under Rule 12(b)(6), then the Court must dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). The significance of Defendants' approach is that dismissal pursuant to Rule 12(b)(1) forecloses any issue of supplemental jurisdiction over the state law claims. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501–02 (2006) (explaining when federal court concludes it lacks subject matter jurisdiction, the complaint must be dismissed in its entirety; in contrast, with a motion to dismiss for failure to state a federal claim,

the court generally retains discretion to exercise supplemental jurisdiction over pendent state-law claims).

Under Federal Rule of Civil Procedure 12(b)(1), a defendant can move for dismissal of a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. With a factual attack, "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment[,]" and "it … need not presume the truthfulness of the plaintiffs' allegations." *White*, 227 F.3d at 1242. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

"Jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional and must satisfy the requirements specified in *Bell v. Hood,* 327 U.S. 678 (1946)." *Sun Valley Gas., Inc. v. Ernst Enters.,* 711 F.2d 138, 140 (9th Cir.1983). The Supreme Court has determined that jurisdictional dismissals are warranted "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.,* 327 U.S. at 682–83. "[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or

1
2

at trial." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citing *Thornhill,* 594 F.2d 730, 733–35 (9th Cir. 1985) (simplified)).

3
4
5
6
7
8
9
10
11
12
13
14
15
16

Here, Defendants argue that the FAC fails to state a claim because "at bottom, it has provided no factual allegations to show that any of the materials that it claims that [Defendants] removed are a trade secret." Therefore, by failing to allege any facts to bring Defendants' conduct within the realm of federal law, the DTSA, Plaintiff fails to invoke federal question jurisdiction and the action must be dismissed under Rule 12(b)(1). Usually when a statute provides both the basis for subject matter jurisdiction and the substantive claim for relief, entwinement exists which makes it improper to dismiss an action for lack of jurisdiction instead of for failure to state a claim, unless the allegations are frivolous. *Safe Air for Everyone*, 373 F.3d at 1039–40 (citing *Thornhill Publ'g Co.,* 594 F.2d at 734)). Defendants do not argue Plaintiff's trade secret claim is immaterial or made solely to obtain federal jurisdiction or wholly insubstantial and frivolous. The question of whether Plaintiff's alleged trade claim comes within the reach of the DTSA goes to the merits of Plaintiff's action. Therefore, dismissal under Rule 12(b)(1) is not appropriate, and the Court considers Defendants' motions to dismiss pursuant to Rule 12(b)(6).

17
18
19
20
21
22
23
24
25
26
27
28

Under Rule 12(b)(6), a defendant can move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Dismissal is appropriate when the complaint fails to provide "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint … has not shown—that the pleader is entitled to relief." *Id*. at 679 (citing Fed. R. Civ. P. 8(a)(2)). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but

it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556).

"In assessing whether a party has stated a claim upon which relief can be granted, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party; but 'conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal.'" *Turner v. City & Cnty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009)). Not only must a complaint "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" its "factual allegations … must [also] plausibly suggest an entitlement to relief such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). However, "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)," *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), and review of a Rule 12(b)(6) motion is "limited to the content of the complaint," *N. Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983), or to "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading," *Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir. 2005).

Having rejected the Rule 12(b)(1) motion, the Court must consider Defendants' request to refrain from exercising federal jurisdiction under the abstention doctrine. Both Defendants ask the Court to take judicial notice of extrinsic information on Plaintiff's website. (Docs. 36, 37.)

Plaintiff does not object to the request for judicial notice. (Plaintiff's Response to Motion to Dismiss (P. Resp. A. MTD) (Doc. 47, n.1 at 6.) The Court takes judicial notice of Berkadia's website. The Plaintiff responds to the motions to dismiss by arguing that it has sufficiently alleged a claim under the DTSA, the Court should exercise supplemental jurisdiction over any state-law claims, and not abstain from exercising jurisdiction under

the abstention doctrine. The Plaintiff asks, if the Court does dismiss the action under Rule 12(b)(6), it should be granted leave to amend the FAC. (P. Resp. A. MTD (Doc. 47); (P. Resp. to C. MTD) (Doc. 48).

### A. The Defend Trade Secrets Act (DTSA) Claim: Trade Secret Misappropriation

"To state a claim for trade secret misappropriation under the DTSA … , a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (cleaned up). Under the DTSA, a "trade secret" is defined broadly as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). "Therefore, the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).

To plead misappropriation of trade secrets, the FAC must identify the trade secret with sufficient particularity to provide notice to a defendant of what he is accused of misappropriating and for this Court to determine whether misappropriation has or may occur. *See: Visionair v. James*, 606 S.E.2d 359, 364 (N.C.App.2004) (injunction properly

denied where trade secret described only in broad product and technology categories); *Washburn v. Yadkin Valley Bank and Trust Co.*, 660 S.E.2d 577, 586 (N.C.App.2008) (finding "employer's business methods, clients, and other confidential information pertaining to employer's business" insufficient to state a claim for misappropriation of trade secrets), *compare N.C. Elec. Membership Corp. v. N.C. Dept. of Economic and Community Dev.*, 425 S.E.2d 440, 444 (N.C.App.1993) (holding documents containing pricing information, market forecasts, and feasibility studies that were developed unilaterally by the party were trade secrets). "To be sure, a plaintiff need not spell out the details of the trade secret." *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (simplified; citation omitted). "Nevertheless, [it] must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Vendavo*, 2018 WL 1456697, at *4 (quoting *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012)). "'[A]llegations that set out purported trade secrets in broad, categorical terms that are merely descriptive of the types of information that generally *may* qualify as protectable trade secrets are insufficient to state a claim.'" *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1048 (N.D. Cal. 2020) (quoting *Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, 2020 WL 513287, at *7 (N.D. Cal. Jan. 31, 2020)).

Courts in this circuit have rejected general descriptions of misappropriated customer lists and customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, ideas and plans for product enhancements, marketing strategies, and product composition, as insufficient to allege a violation of the DTSA. *See Cisco Sys., Inc.*, 462 F. Supp. 3d at 1048 (collecting cases).

In its FAC, Plaintiff lists alleged trade secrets as: "the company's database of customers and prospects, information concerning closed, pending and potential sales,

marketing information, Plaintiff's financial information, client emails, cash statements, client-tenant information and cash flows, client purchase agreements, deal preferences, and loan terms. *See* (FAC (Doc. 29), ¶¶ 44.) Plaintiff adds: "past transactional information and business opportunities." *Id.* ¶2. Plaintiff asserts that because the industry is "so relationship driven," trade secret information includes communications with longstanding customer. *Id.* ¶¶54-5.

The FAC accuses Defendants of misappropriating trade secrets by not immediately returning them when they terminated their employment and alleges Defendants began stealing customer-related data in November 2021, *id.* ¶61, and in December 2021, including: information regarding client properties pertinent to real estate services being provided, *id.* ¶63; over 300 emails forwarded January 10, 2022, containing enormous amounts of informational documents, including cash statements, and other documents related to cash flows regarding Peaks at Redington, *id.* ¶66, and other emails containing client purchase agreements, deal preferences, and loan terms regarding Downtown Tucson, *id.* ¶ 68.

In Count 9, the trade secret claim, Plaintiff alleges it is the owner of valuable trade secrets as follows: detailed compilations of customer information, the customer and prospect database, information concerning closed, pending, and potential sales, marketing information, and financial information concerning Plaintiff and their clients. *Id.* ¶ 143. Plaintiff alleges that Defendants misappropriated, retained, and continue to use the trade secrets belonging to Plaintiff. *Id.* at 144.

While the Court acknowledges that some of Plaintiff's general descriptions fail to sufficiently identify a trade secret (e.g., "marketing information" and "various information conveyed" in client emails), Plaintiff's allegations are descriptive of the types of information that generally *may* qualify as protectable trade secrets.

In Count 9, Plaintiff states the trade secret is "compilations" of customer information; the customer data includes "prospect" customer information, and sales information includes closed, pending, and potential sales information. As noted above, the

allegedly misappropriated 300 emails are particular to Peaks at Redington and other emails containing client purchase agreements, deal preferences, and loan terms are for Downtown Tucson.

As explained in *Cisco,* descriptions of categories of information purportedly misappropriated that are insufficient to state a trade secret claim can be narrowed by more specific allegations in a complaint to qualify them as the types of information that may be trade secrets. *Cisco,* 462 F.Supp. 2d at 1049. To state a trade-secret claim there must be sufficient specificity for Defendants and the Court to discern the boundaries within which the alleged secrets lie and the scope of appropriate discovery. *Id.* The Court finds that, even as qualified, Plaintiff alleges only categories of information that *may* be trade secrets.

The DTSA definition of trade secrets consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Supra. above* (citing *InteliClear*, 978 F.3d at 657). Prior to the enactment of the DTSA, federal courts applied the appropriate trade secret law of the appropriate state. *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1116 (Fed. Cir. 1996). In *Experian Information Solutions, Inc. v. Nationwide Marketing Services Inc.*, the United States Court of Appeals for the Ninth Circuit observed:

> Arizona has adopted the Uniform Trade Secret Act [(UTSA)], which defines a trade secret as information that derives independent economic value from not being known or readily ascertainable by the plaintiff's competitors and is the subject of reasonable efforts to maintain secrecy. A trade secret does not consist of matters of public knowledge. The subject matter of trade secrets must be sufficiently novel, unique, or original that it is not readily ascertainable to competitors. Arizona courts have considered customer lists and have held that a trade secret cannot ordinarily consist of matters of public knowledge. Nonetheless, if a business spends considerable effort and resources in developing its trade secret, the trade secret may be protected.

93 F.3d 1176, 1188 (9th Cir. 2018) (citing A.R.S. § 44-401(4) (trade secret information "[d]erives independent economic value" from not being known or readily ascertainable by the plaintiff's competitors and is the subject of reasonable efforts to maintain secrecy). "Because the hallmark of a trade secret is secrecy, the two-part inquiry under the UTSA focuses on: first, whether the subject matter of the information is secret; and second,

whether reasonable efforts have been taken to keep the information secret." *Calisi v. Unified Financial Services, LLC.,* 302 P.3d 628, 631 (Ariz. App. 2013).

Defendants argue that Plaintiff fails to allege any facts which plausibly show that information concerning their sales or customers was not "generally known" or "readily ascertainable" by Plaintiff's competitors. (A. Wadlund's Motion to Dismiss (MTD) (Doc. 36) at 5-7); (C. MTD/Abstain (Doc. 37) at 5). All real estate transactions in Arizona are a matter of record; Plaintiff publicly announced the transactions involving the Defendants; all the alleged trade secret material was shared with third parties including buyers, brokers for the buyers, title companies, lending banks, appraisers, etc. As a matter of law, Defendants argue that client data bases are not trade secrets when the information contained in them can be readily found from public sources. (C. MTD/Abstain (Doc. 37) at 5 (citing *S-E-A, Ltd. v. Cornetto*, No. CV JKB-18-1761, 2018 WL 3996270, at *3 (D. Md. Aug. 21, 2018) (finding names and contact information for potential clients needing forensic financial services, i.e., insurance companies, insurance adjusters, attorneys, and risk managers, may be identified through publicly accessible resources and likely targeted by others in the same forensic consulting profession).

In response, Plaintiff asserts it is the unique compilation of its data in its data base that makes its customer data a trade secret, and it does not seek trade secret protection for the public record information that is required by law for every real estate transaction in Arizona, which is limited to reporting information on closed sales. *But see* (FAC (Doc. 29) ¶ 143) (including information for "closed" sales). Plaintiff responds that it only alleges information related to "prospective" customers is a trade secret. It does not respond to Defendant A. Wadlund's assertion that there can be no trade secret protection for the downtown Tucson information allegedly misappropriated by him because he owns that property.

As a matter of law, Plaintiff cannot show any legally protectable trade secret interest in the individual names or addresses of consumers because such information are matters of public knowledge found in the public domain; Plaintiff cannot own such information.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs., Inc.,* No. CV-13-00618-PHX-SPL, 2016 WL 11414803, at *8 (D. Ariz. Sept. 30, 2016), *aff'd in part, rev'd in part and remanded,* 893 F.3d 1176 (9th Cir. 2018) (citing *Enterprise Leasing Co. of Phoenix v. Ehmke,* 3 P.3d 1064, 1068, (Ariz. Ct. App. 1999) ("Trade-secret law ... provides protection to the *owner* of a trade secret." (emphasis added)); *Calisi,* 302 P.3d at 631. So, while a customer list must be more than a mere compilation from directories or other generally available sources, *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018) (citing *Calisi,* 302 P.3d at 632, if a business spends considerable effort and resources in developing its trade secret, the trade secret may be protected. *id.* (further citations omitted). To assert a compilation of customer data is a trade secret, Plaintiff must allege facts to support its assertion that the compilation is "sufficiently novel, unique, or original that it is not readily ascertainable to competitors." *Id.* (citing *Calisi,* 302 P.3d at 63; *Ehmke,* 3 P.3d at 1069)).

The FAC does not allege facts showing its customer data and/or data base is novel or that it contains data that is not readily ascertainable to competitors. It does not allege facts showing how Plaintiff's customer data and/or its compilation is unique. It does not provide facts showing it "invests substantial resources to create, compile and maintain" it. (FAC (Doc. 29) ¶ 145(b)). The facts alleged in the FAC do not show how or why and what customer information is of economic value to Plaintiff because it is kept secret and how disclosure of this information is of economic value to its competitors. The FAC ¶ 145(a)-(e) contain summary assertions, not factual allegations.

"'To state a claim for trade secret misappropriation under the DTSA … , a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff.'" *Supra above* at p.12 (citing *Alta Devices, Inc.*, 343 F. Supp. 3d at 877). The Court finds that Plaintiff has alleged categories of information that *may* be trade secrets, which require further qualification so that this Court and Defendants may discern specifically the information within these categories that are trade secrets.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"[A]t the pleading stage, what matters is that it is plausible on the face of the complaint that these items constitute protectable trade secrets." *Mellberg LLC v. Will,* 96 F.Supp.3d 953, 976 (Ariz. 2015) (cleaned up). The FAC sufficiently alleges Plaintiff's efforts to keep customer data secret, pursuant to express confidentiality provisions contained in the Defendants' contracts, the independent contractor agreements (ICA) and A. Wadlund's Transitional Compensation and Release Agreement (CRA). Plaintiff has alleged damages. *See* FAC ¶ 150 (alleging actual damages and loss of economic value of the trade secrets.) Plaintiff alleges that Defendants have now obtained listings for IPA, Plaintiff's competitor, and started working on sales that should have been listed by Plaintiff. *Id.* ¶ 70.

Plaintiff has, however, failed to state a claim for trade secret misappropriation because Plaintiff fails to allege facts showing it owns trade secrets that are valuable because they are unknown to others. Plaintiff may amend the FAC to allege factual allegations supporting what are largely conclusory assertions made in ¶ 145(a)-(e). The breadth of Count 9, the DTSA claim, is inconsistent with qualifying information as trade secrets pursuant to specificity from other areas of the FAC. For example, are the alleged misappropriations of detailed compilations of customer information, customer and prospect database, information concerning sales, etc., limited to November and December 2021; are the email misappropriations limited to Peaks at Redington and Downtown Tucson? The Court finds that the FAC allegations of trade secret in Count 9, as qualified by other allegations in the FAC, lack sufficient particularity to separate the trade secrets from matters of general knowledge in the trade and do not permit Defendants to ascertain at least the boundaries within which the secret lies.

Plaintiff seeks leave to amend the FAC in the event the Court dismisses it pursuant to Fed. R. Civ. P. 12(b)(6). Such leave is freely granted when justice so requires. Fed.R.Civ.P. 15(a)(2).

"Absent dismissal of Berkadia's DTSA claim, the Motion to Dismiss contains no argument that this Court should refuse to accept supplemental jurisdiction over Berkadia's

other claims." (P. Resp. to C. MTD (Doc. 48) at 10.) The Court has original jurisdiction over the federal trade secret claim under the DTSA; it has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* (quoting 28 U.S.C. § 1367(a)). "[C]laims form part of the same case or controversy if they arise from a common nucleus of operative facts, such that a plaintiff would ordinarily be expected to try them together in one judicial proceeding." *Id.* (quoting *Arroyo v. Rosas*, 19 F.4th 1202, 1209 (9th Cir. 2021)). The state law claims, including the state trade secret claim under the AUTSA, arise from the same core of operative facts as the trade secret claims. Even if at some later point in time the Court dismisses the DTSA claim on the merits, it has discretion to under 28 U.S.C. § 1367(c) to retain supplemental jurisdiction to adjudicate the remaining state law claims. *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001). If the Court dismisses the DTSA claim on the merits, it shall consider whether to exercise its discretion to retain supplemental based on the circumstances existing then.

### B. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976): Abstention

Defendant C. Wadlund moves in the alternative for the Court to abstain from exercising federal jurisdiction in favor of the case being adjudicated in a state forum. Abstention is the exception, pursuant to *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976), not the rule. The Court has a duty to adjudicate a controversy properly before it, and only abstains under "'exceptional circumstances where [ordering] the parties to repair to the state court would clearly serve an important countervailing interest.'" *Id.* (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-189 (1959)); *Moses H. Cone Meml. Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 26 (1983).

The standard for determining whether exceptional circumstances exist includes an assessment of the following factors: (1) which court assumed jurisdiction first over any

property at stake in the case; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all the issues before the federal court. *Seneca Ins. Co., Inc. v. Strange Land, Inc*., 862 F.3d 835, 842 (9th Cir. 2017). This Court must carefully weigh these factors, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses*, 460 U.S. at 16. "Any doubt as to whether a factor exists should be resolved against a stay, not in favor of one." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).

The first two factors are not relevant because the case does not involve a piece of property and both federal and state forums are located in Tucson, Arizona, within a few blocks of each other. The Court turns to the third factor: whether abeyance will help avoid piecemeal litigation.

Plaintiff's FAC alleges that Defendants conspired to leave Plaintiff and accepted positions with a direct competitor in violation of restrictive covenants in their employment[3] contracts while misappropriating Plaintiff's trade secrets, business opportunities, staff, and customers along the way. (FAC (Doc. 29) ¶¶ 1, 61-83.) Plaintiff's FAC includes claims as follows: Breach of Contract, Counts I–IV; Tortious Interference, Counts V–VIII; the Defend Trade Secrets Act (DTSA), Count IX; the Arizona Uniform Trade Secret Act (AUTSA), Count X; Civil Conspiracy, Count XI; Conversion, Count XII; Unjust Enrichment, Count XIII, and Breach of Duty of Loyalty, Count XIIII.

The cases filed by the Wadlunds in state court have now been consolidated. They seek a declaratory judgment that they did not breach the ICAs and Berkadia may not enforce non-compete clauses to impede Defendants' ability to continue work as real estate salespersons. The Wadlunds sue for damages due to Berkadia's breach of the ICAs for nonpayment of commissions and tortious interference with their employment. The state

---

[3] The Court understands that the employment relationships are governed by Independent Contractor Agreements (ICA).

court proceeding has been stayed pending a ruling from this Court on the motions to dismiss.

The parties present flipsides to the breach of contract and tortious interference claims, with Berkadia adding state claims of civil conspiracy, conversion, unjust enrichment, and trade secret violations under the AUTSA, and the federal DTSA claim. The elements of a trade secret misappropriation claim under the DTSA and AUTSA are virtually identical. (P. Resp. to C. MTD (Doc. 48) at 10 (citing *compare GlobalTranz Enterprises Inc. v. Murphy*, CV-18-04819-PHX-ROS, 2021 WL 1163086, at *11 (D. Ariz. Mar. 26, 2021); with *Ehmke*, 3 P.3d at 1069 (Ariz. App. 1999)). A judgment on the merits by either court would have preclusive effect on the other. *Travelers,* 914 F.2d at 1369.

"'Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results.'" *Seneca,* 862 F.3d at 842. (quoting *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co*., 843 F.2d 1253, 1258 (9th Cir. 1988)). A general preference, alone, for avoiding piecemeal litigation is insufficient to warrant abstention, and any case which implicates *Colorado River* will inevitably involve the possibility of "'conflicting results, piecemeal litigation, and some duplication of judicial efforts,'" which are the "'unavoidable price of preserving access to ... federal relief.'" *Id.* at 842-43 (quoting *Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines*, 925 F.2d 1193, 1195 (9th Cir. 1991)) (simplified). "[T]here must be exceptional circumstances present that demonstrate that piecemeal litigation would be particularly problematic." *Seneca,* 862 F.3d at 843. Nevertheless, piecemeal litigation is a substantial factor in the *Colorado River* analysis, *id.* at 842, therefore, the Court considers whether there are special concerns associated with resolving the issues in this case in a piecemeal fashion via parallel proceedings.

Plaintiff argues: "As an initial matter, this case involves significantly more and different claims than those in the state court proceeding." (P. Resp. to C. MTD (Doc. 48) at 14.) This is true but only because Plaintiff chose to not plead the trade secret claims as counterclaims in the state proceeding and instead raised them in this separate action.

Nevertheless, the Court considers the cases as they are, not as they might have been plead. *See R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 982 (9th Cir. 2011) (explaining courts generally rely on the circumstances at the time of the *Colorado River* analysis). Plaintiff ignores the potential possibility that the two forums will reach different results on the contract and tortious interference claims. It appears that the stay in the state court will preclude this conflict.

The claims at issue in this case, contract and tortious interference, are not particularly novel or unique. Such claims do not entail rare circumstances warranting abstention. *Travelers*, 914 F.2d at 1370. The claims in this case are not like those found in *Colorado River* which involved multi-state water-rights litigation with important real property rights at stake at the state level. This case is more in keeping with *Seneca* where the Court explained that ordinary contract and tort issues, even when multiple parties are involved and there are numerous claims and crossclaims, are not special concerns favoring federal abstention. The third factor does not tip towards abeyance. *Seneca,* 862 F.3d at 843.

Fourth, the Court looks to the order in which the forums obtained jurisdiction and analyzes the progress made in each case "'in a pragmatic, flexible manner with a view to the realities of the case at hand.'" *Seneca*, 862 F.3d at 843 (quoting *Moses*, 460 U.S. at 21). It appears that the Wadlunds filed the state cases only a few days before Berkadia filed this case. According to Plaintiff, the state court proceeding has not progressed any further than this case and will progress no further because it has been stayed pending resolution of these motions to dismiss. (P. Resp. to C. MTD (Doc. 48) at 15.) Attached to the motion to vacate (Doc. 46) are copies of briefs that suggest at least one dispositive motion has been fully briefed in the state case. *See* (Wadlund "Response to Berkadia's Motion for Rule 56(d) Relief" (Doc. 46-1) 2) and (Wadlund "Reply in Support of Motion for Partial Summary Judgment" (Doc. 46-1) at 45.) Without more, however, the Court finds that the few days that the Wadlunds filed in state court before Berkadia filed its claims in federal court do not tip the scale in favor of abstention.

Fifth, when considering whether federal law or state law provides the rule of decision on the merits, the existence of federal-law issues is always a major consideration weighing against abstention. *Seneca*, 862 F.3d at 844. In contrast, the presence of state-law issues only weighs in favor of abstention in rare circumstances. *Id.* As already noted above, the state contract and tort claims are not complex and difficult issues better resolved by a state court. Plaintiff's addition of the DTSA claim, here favors denying abstention.

Sixth, the inadequacy of the state court proceedings, is a factor which looks at whether the state court might be unable to enforce federal rights, *Seneca*, 862 F.3d at 845, and if so, then this factor precludes abstention, *id.* As the cases currently stand, this final factor weighs against abstention. The trade secret claims are not part of the state proceeding. Assuming the trade secret claims could be added there, then the state court would be capable of protecting the rights of both litigants. Assuming such capability, this one factor, alone, is not enough to warrant abstention. *Travelers*, 914 F.2d at 1370 (finding factor to be neutral even though the state court could adequately protect the rights of the parties). In other words, abstention is not precluded by this factor, but it is not favored.

The seventh factor is forum shopping, which focuses on "whether either party improperly sought more favorable rules in its choice of forum or pursued suit in a new forum after facing setbacks in the original proceeding." *Seneca*, 862 F.3d at 846. "It typically does not constitute forum shopping where a party 'acted within his rights in filing a suit in the forum of his choice,'" *Id.* at 842 (quoting *Travelers*, 914 F.2d at 1371 (citing *R.R. St. & Co. Inc.*, 656 F.3d at 981-82 (finding court should be cautious labeling plaintiff's desire to bring previously unasserted claims in federal court as forum shopping)). The timing of the filings, five days apart, does not support a finding of forum shopping. Defendants argue that Berkadia is seeking to delay resolution of the state case by filing in federal court, seeking excessive discovery, and asking that Judge Hinderaker's Order be vacated. Any delay, however, does not indicate manipulation of the litigation or vexatious behavior by Plaintiff to wind up in the forum of its choosing. This Court declines to label it forum shopping for Plaintiff to choose a federal forum to bring this action, alleging a

1
2

federal trade secret claim, rather than raising it as a counter claim in the state action. This seventh factor does not favor abstention.

3
4
5
6
7
8
9
10
11
12
13

The eighth and final factor is whether the state court proceedings will resolve all the issues before the federal court. Here, the Court considers "whether the parallel proceedings address 'substantially similar' claims." *Seneca*, 862 F.3d at 845. "Parallelism is a necessary precondition for *Colorado River* abstention, but not sufficient alone to warrant abstention. *Id.* As the Court has already recognized when considering whether abeyance would help avoid "piecemeal litigation," these two cases as filed are different, with this case essentially including counterclaims which Berkadia could have but didn't raise in the state case. Even though Plaintiff's claims stem from the same set of facts, they are absent from, and thus will not be resolved by, the Pima County Superior Court proceeding. Relying on "the state of affairs at the time of [this] *Colorado River* analysis," *R.R. St. & Co*., 656 F.3d at 982, this final factor weighs against abstention.

14
15
16
17

The Court finds that the balance of the factors cut against abstention, especially when the balance should be weighted against abstention. There are no exceptional circumstances to warrant an abdication of this Court's subject matter jurisdiction over this federal cause of action. The alternative motion for abstention is denied.

18

**MOTION TO QUASH SUBPOENAS AND FOR PROTECTIVE ORDER**

19
20
21
22
23
24
25
26
27

On June 2, 2022, Defendants filed their motion to quash subpoenas and for a protective order. (Doc. 63.) On June 10, 2022, Plaintiff filed its response to Defendants' motion (Doc. 65); and on June 17, 2022, Defendants filed their reply in support of their motion to quash (Doc. 69).  As a related matter, the Court has reviewed the Supplemental Rule 26(f) Report (Rule 26 Report) filed on June 17, 2022. (Doc. 70.) The motions and proposed case management deadlines for discovery in the Rule 26 Report reflect some confusion by the parties regarding the breadth of discovery, which the Court intended to clarify at the Scheduling Conference on August 23, 2022. Instead, the Court makes those clarifications now in order to address issues relevant to the non-party subpoenas.

28

The Wadlund Defendants complain that Plaintiff has issued eight Rule 45 subpoenas to non-parties, which include approximately 40 areas of document requests for each subpoenaed non-party or approximately 402 separate requests for documents and communications. Plaintiff has also served Requests for Admissions, with 53 to Defendant A. Wadlund and 44 to C. Wadlund, and Interrogatories, with 23 to A. Wadlund and 20 to C. Wadlund. Defendants submit that this discovery fails to comply with the Court's directive for the "'parties to minimize the expense of discovery.'" (Motion to Quash and for Protective Order (MTQ/MFPO) (Doc. 63) at 2 (quoting Order (Doc. 52) at 5)).

Defendants challenge the relevancy of the non-party discovery because it seeks information related to Plaintiff's alleged clients, which is relevant only if Plaintiff can establish its claim that it had exclusive contractual relationships with its clients or can establish enforceable non-solicitation covenants existed in Defendants' IACs. Defendants spend a considerable amount of time briefing the lack of merit for these claims. Defendants argue that the subpoenas should be quashed because they are unduly burdensome and not proportional to any need for resolving the case.

Rule 26(b)(1) provides that the scope of discovery, unless otherwise limited by court order, is as follows: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery out weights its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Defendants ask the Court to exercise its power to alter and limit discovery because it "is unreasonable, cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P 26(b)(2)(C).

Plaintiff responds that Defendants do not have standing to assert a motion to quash third-party subpoenas. "'Ordinarily a party has no standing to seek to quash a subpoena

issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought.'" (P. Resp. MTQ/MPO (Doc. 65) at 2-3 (quoting *Davenport v. SP Jedi Inc*., No. CV-18- 02580-PHX-SMM, 2019 WL 8226377, at *1 (D. Ariz. Apr. 19, 2019) (simplified). *See also Equal Emp. Opportunity, Comm'n v. Bashas', Inc.*, No. CIV 09-0209 PHX RCB, 2009 WL 5206632, at *8 (D. Ariz. Dec. 24, 2009) (denying request to quash third-party subpoenas because the EEOC failed to prove that the information sought was privileged or that production would subject it to undue burden). Plaintiff asserts Defendants lack standing to oppose the non-party subpoenas as unduly burdensome. According to Plaintiff, these non-parties have secured counsel and served individualized objections, and Plaintiff will "negotiate with each of the Non-Parties in good faith to limit their burden as appropriate while obtaining the documents it needs to litigate this matter." *Id.* at 65.

Defendants do not disagree with the law as presented by Plaintiff and assert that they do have personal rights and/or privileges regarding information and documents sought from the non-parties. Defendants argue that the discovery requests are without limitation and may reach their personal and private information, such as their personnel records, current banking arrangements, personal emails, and emails relating to transactions that they are pursuing having nothing to do with Berkadia.

Defendants do not go over all 322 separate requests within the eight subpoenas issued by Plaintiff, but they do provide examples of overbreadth and overreach. *See* (P. Reply to MTQ (Doc. 69) at 2-3.) The Court is not going to issue definitive rulings on the few objections which are provided with sufficient specificity to support individualized determinations but quashes the nonparty subpoenas because they lack limitations needed to assess relevancy, such as time frames or subject matter clarity.[4] The Court quashes the

---

[4] For examples: Plaintiff's Subpoena to Marcus & Millichap, the Defendants current Broker, seeks "Any and all Documents provided to You by C. Wadlund, A. Wadlund, Hartley, or Ying"; another subpoena seeks "All calendars, including any personal calendars kept by Lisa Hartley" and a demand for Lisa Hartley to turn over her personal computer and personal cell phone to Plaintiff in Pennsylvania. The Court notes that places of compliance for commands to attend a deposition or produce documents must be within 100 miles of where the person resides. Fed. R. Civ. P. 45(c).

subpoenas without prejudice to Plaintiff's ability to reissue them with sufficient limitations to reflect relevancy of the discovery to the issues and claims in this case. Any reissuance of the subpoenas should await Plaintiff's amendment to the FAC.

Additionally, the Court provides direction regarding the breadth of reasonable discovery in this case, which may be central to Plaintiff's decision to reissue the non-party subpoenas being quashed now by the Court. The Court begins with the discovery schedule proposed in the Supplemental Rule 26(f) Report. While the parties cannot agree on most things, including whether the Rule 26(a) disclosures have been made, (Rule 26 Report (Doc. 70) at 19, 22), both parties agree that discovery can be completed in 180 days, *id.* at 24, and propose a trial date of November 1, 2022, *id.* at 27.

The Court finds no reason for discovery in this case to be more involved than discovery in any other standard track case. The Court intends to set a case management schedule to allow for 180 days of discovery, which shall commence from the entry of the Case Management Scheduling Order. The Federal Rules of Civil Procedure shall govern discovery, including the number of interrogatories (25) and depositions (10), without leave of the Court for more. Plaintiff proposes 100 requests for admissions, including subparts and 50 requests for production of documents, including subparts. Defendants suggest numbers for document requests and requests for admissions per party, which when combined are approximately the same as the totals proposed by Plaintiff. Accordingly, the Court will allow the following: requests for production 50 per party, including subparts; requests for admissions 50 per party, including subparts.

To be clear, the inflammatory accusations being made by the parties against each other are not helpful to the Court or to resolving this case. The Court anticipates that counsel for both parties, who are equally skilled in the law, can prosecute their cases without unnecessary excesses, including taking care to obtain discovery in compliance with Rule 26 and the Court's directive to minimize the expense of discovery. (Order (Doc. 52) at 5.)

Counsel shall review Rule 26(b)(1), which requires the parties to consider the need for discovery proportional to the claims or defenses and whether a party may more conveniently and with less burden obtain the discovery elsewhere. For example, can communications between the non-parties and Defendants be discovered in house by Plaintiff; does it retain Defendants' work-computers and/or have access to Defendants' work emails sent during the relevant two to three-month time period? Has Plaintiff narrowed the discovery requests to non-parties based on in-house information of communications between the Defendants and non-parties and/or can this discovery be obtained from Defendants? The parties are reminded that Fed. R. Civ. P.45(d)(1) requires counsel to take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena and failure to take this responsibility seriously may result in sanctions. The Court assumes it does not need to remind counsel that by signing discovery disclosures that they certify to the same reasonableness standards and sanctions may be imposed for improper certification. Fed. R. Civ. P. 26(g).

The Court affirms the August 23, 2022, date for the Scheduling Conference, and there shall be no further extensions of time. While the Federal Rules of Civil Procedure provide for discovery to commence after the conference between the parties, pursuant to Rule 26(f), the Court directs that the 180 days for discovery shall commence when the Court issues the Scheduling Order following the August 23, 2022, Scheduling Conference. At the Scheduling Conference the parties shall be prepared to discuss deadlines for filing partially dispositive motions to resolve issues or claims which once resolved may narrow the scope of discovery. In the event any party has failed to comply with Rule 26(a)(1), it shall immediately comply with the rule to make the initial disclosures, which were required "without awaiting a discovery request" "at or within 14 days after the parties' Rule 26(f) conference." Rule 26(a)(1)(A),(C).

**Accordingly,**

**IT IS ORDERED** that Plaintiff's Motion to Vacate Order Denying Plaintiff's Motion for Temporary Restraining Order (Doc. 41) is DENIED.

1    **IT IS FURTHER ORDERED** that Arthur R. Wadlund's Motion to Dismiss

2    Plaintiff's First Amended Verified Complaint (Doc. 36) and Clint Wadlund's Motion to

3    Dismiss Plaintiff's First Amended Complaint or in the Alternative[,] Abstain (Doc. 37) is

4    GRANTED, except the request for abstention is DENIED.

5    **IT IS FURTHER ORDERED** that Plaintiff has leave to file a Second Amended

6    Complaint, which shall be due within 14 days of the filing date of this Order.

7    **IT IS FURTHER ORDERED** that Defendants Arthur R. Wadlund and Clint

8    Wadlund's Motion to Quash Subpoenas and for a Protective Order (Doc. 63) is GRANTED

9    IN PART to quash the subpoenas and DENIED IN PART for a protective order; the

10   subpoenas are quashed without prejudice to being reurged following the filing of the

11   Second Amended Complaint.

12   **IT IS FURTHER ORDERED** affirming the Scheduling Conference date of

13   August 23, 2022.

14   Dated this 9th day of August, 2022.

15

16

17   Honorable Cindy K. Jorgenson
     United States District Judge

18

19

20

21

22

23

24

25

26

27

28